UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


HEIDI AUSTIN,

              Plaintiff,

        v.

WAL-MART STORES, INC.,
a Delaware corporation,

              Defendant.

_____

Civil No. 07-1306-HA

OPINION AND ORDER


HAGGERTY, Chief Judge:

       Plaintiff alleges that her former employer, Wal-Mart Stores, Inc., discriminated and

retaliated against her in violation of Oregon Revised Statutes (ORS) 659A.112 *et seq.*  Defendant

filed a Motion for Summary Judgment [35] and oral argument was held on September 3, 2008.

For the following reasons, defendant's motion is granted in part and denied in part.


PAGE 1 - OPINION AND ORDER

## STANDARDS

### 1.    Summary Judgment

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see Bahn v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). The moving party carries the initial burden of proof and meets this burden by identifying portions of the record on file that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the non-moving party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Id.*

The court must view the evidence in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (citations omitted). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *MetroPCS, Inc. v. City and County of S.F.*, 400 F.3d 715, 720 (9th Cir. 2005) (citation omitted). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981) (citing Fed. R. Civ. P. 56(c)).

Deference to the non-moving party has limits. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The "mere existence of a scintilla of evidence in support of the [non-moving party's] position would be insufficient." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 252 (1986). Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

      **2.     Disability Discrimination**

Oregon's Discrimination Against Disabled Persons in Employment Act (the Oregon Act) is in part modeled after the Americans with Disabilites Act (ADA) and contains language that is similar to the ADA. *Compare* 42 U.S.C. § 12102(2) (defining "qualified individual with a disability" as someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position . . .") *with* ORS 659A.115 (defining an individual as "qualified" if "the person, with or without reasonable accommodation, can perform the essential functions of their position"). Oregon's statute is to be construed "to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act." ORS 659A.139. Accordingly, Oregon courts look to the ADA to interpret the Oregon Act. *Centennial Sch. Dist. No. 28J v. Oregon Bureau of Labor and Indus.*, 10 P.3d 945, 954 (Or. Ct. App. 2000) (applying "ADA decisional law" and concluding that defendant violated the Oregon Act).

## BACKGROUND

The following facts are undisputed unless otherwise noted and are stated in the light most favorable to plaintiff.

Plaintiff was employed by defendant from August 23, 2006, to June 28, 2007. Plaintiff was hired as a part-time fitting room associate at defendant's store in Clackamas, Oregon.

Plaintiff suffers from cerebral palsy and is confined to a wheelchair. Defendant was aware that plaintiff had physical limitations when she was hired. Plaintiff informed defendant

when she was hired that she "might not be as fast as everyone else" and might need help or an accommodation. Pl. Dep. 33:1-18.

The job duties of a fitting room associate, as defined by defendant, include: "[P]roviding fitting room assistance, such as leading customers to a fitting room . . .;" "Using fine motor skills and coordination to constantly and swiftly attach tickets on apparel, answer telephones, transfer calls by pressing buttons, and make pages;" "[M]oving through narrow aisles and enclosed Fitting Rooms and surrounding area;" and "[P]rocessing returned merchandise and keeping the area neat and organized and properly secure merchandise, such as shirts, pants, and belts, which involve . . . placing apparel on the correct hangers and ensuring they are supplied a pricing label/ticket before returning to the salesfloor . . . ." Ex. 8.

### a.    Dealings with Camille Mast

While employed by defendant, plaintiff was scolded numerous times by Camille Mast, a merchandising supervisor. Plaintiff alleges that Mast repeatedly yelled at her. According to plaintiff, Mast's criticisms included "saying that I wasn't doing my job correctly, having clothes thrown back at me because they weren't done exactly the way she wanted, not being too quick enough, not doing things exactly the way she wanted it – like buttoning a button a certain way, or tying something a certain way, or folding something a certain way . . . ." Pl. Dep. 54:20-55:1. According to plaintiff, Mast accused her of leaving items on a bench and of hanging up clothes the wrong way; plaintiff asserts that she never handled the clothes in question. When plaintiff took issue with the way Mast wanted her to do things, Mast called plaintiff "insubordinate." Pl. Dep. 58:10-18. On a single occasion, Mast allegedly accused plaintiff of not being able to read.

PAGE 4 - OPINION AND ORDER

Plaintiff alleges that "Mast broadcast to others that Plaintiff had lice . . . ."  Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. (Pl.'s Mem.) at 7.  Plaintiff, however, admits that she did have head lice on two separate occasions.

Mast told another employee that "she thought Ms. Austin couldn't read because some clothes were hung on numbered racks improperly."  Pl.'s Malsom Decl. ¶ 5.  On one occasion, plaintiff's wheelchair ran over a hanger and became stuck.  Mast told this same employee "how stupid Ms. Austin sounded when she was calling for help."  *Id.* ¶ 7.

Plaintiff made numerous complaints about Mast's abrasive manner to other supervisors, including Assistant Manager Deborah Solis.

### b.    Reasonable Accommodations

Before receiving her ninety-day review, plaintiff was offered a lateral transfer to a "people greeter" position.  The transfer would not have affected plaintiff's pay.  Plaintiff had not requested a transfer and, once it was offered, declined it.  The transfer was not offered a second time.

Plaintiff requested a "grabber" so she could pick things up off the floor while sitting in her wheelchair.  Plaintiff was told that if she purchased a grabber, she would be reimbursed by defendant.  Plaintiff purchased a grabber, but it "disappeared" within a couple of months  Pl. Dep. 35:6; Pl. Supplemental Decl. ¶ 3.  Plaintiff requested a replacement grabber, though she could not recall when she made this request.  Pl. Dep. 34:14.  Defendant informed plaintiff that it would purchase a second grabber for her, though it did not arrive before plaintiff was terminated. Pl. Dep. 35:24-36:1.

One of plaintiff's supervisors suggested that plaintiff would benefit from having a cordless phone in the fitting room. A cordless phone would have made it easier to "answer the phone in a more timely manner" while hanging up clothes. Pl. Dep. 100:4-6.

Plaintiff "also requested accommodations by notifying Defendant that she would need to stage her work differently than others." Pl.'s Mem. at 18. Plaintiff wanted to pre-hang clothes on hangers, and then come back to them as work permitted. Plaintiff also requested the use of a shopping cart, so that "while she was dealing one on one with a customer if she had to answer the phone she could throw the clothes in the cart to allow her hands to be free." *Id*. at 4. Plaintiff received approval from several supervisors for using the cart. However, Mast "would not allow her to do it that way" and yelled at her for staging her work. *Id.* at 5.

Plaintiff had a telephone conversation with Darron Moore, manager of the Clackamas store. Pl. Dep. 77:2-78:20. Plaintiff told Moore that she needed some accommodations to perform her job. Plaintiff informed Moore that she had attempted to do her job differently, but Mast had a problem with her proposed accommodations. Moore told plaintiff that they needed to talk further and suggested that they sit down the next time she came to work. Despite reminding Moore that they needed to have a follow-up conversation, plaintiff never had a second conversation with him.

c.    **Work Performance**

Defendant has a progressive discipline policy. For misconduct and poor performance, the first level of discipline is "Verbal." The second level of discipline is "Written." The third level of discipline is "Decision-Making Day," at which point employees are notified they will be terminated for further violations of Wal-Mart policy. The fourth, and final, level of discipline is "Termination."

PAGE 6 - OPINION AND ORDER

Plaintiff received her initial, ninety-day performance evaluation on November 27, 2006. Plaintiff was given a "Meets Expectations" rating on her evaluation form. Ex. 9. However, the "Areas for Improvement" of the same form indicated that plaintiff: "Needs to improve hanger and apparel grooming;" "Needs to improve how garments are hung;" "Needs to be able to separate the returns in a more timely manner;" "Needs to improve phone skills;" and "Needs to get better at multi-tasking." *Id.*

On January 15, 2007, plaintiff was disciplined for violating defendant's meal-break policy. This was a first-level, "Verbal" warning under defendant's discipline policy.

On February 20, 2007, plaintiff was disciplined for poor performance in the fitting room. This was a second-level, "Written" warning. The notice indicated that plaintiff "continues to lack the sense of urgency needed in the fitting room, there are always carts unfinished, returns not taken care of, and the fitting room in general [is] a mess." Ex. 11.

On April 10, 2007, plaintiff was again disciplined for violating defendant's meal-break policy. This was a third level, "Decision-Making Day" warning. The notice stated that the next disciplinary action would be "Termination."

On June 27, 2007, Market Manager Gerry Skinner and Market Apparel Manager Ruthena Costello toured the Clackamas store. During this tour, Skinner and Costello noticed plaintiff's fitting room was untidy. They reported concerns about the fitting room's appearance to Moore, the store manager. According to Moore, Skinner said that "the fitting room was very unkept, [] the associate was unkept, and [Moore] was to take action and clean up the fitting room." Moore Dep. 26:15-17.[1] Because of this negative feedback, Moore asked Solis to "[m]ake sure you get

---

[1] The court notes that Skinner denies making any comments about plaintiff's personal appearance. Skinner Dep. 14:16-19.

the fitting room cleaned up" and to visit with plaintiff "about her appearance."  Moore Dep.

28:18-29.

The next day, June 28, 2007, plaintiff was terminated.  Solis met with plaintiff and told

her that because of "[c]lothes not hung, carts, things on the bench, and because of that, they were

letting [her] go."  Pl. Dep. 131:14-15.  Although plaintiff did not disagree with Solis' assessment

of the fitting room, she tried to explain that there were "circumstances" why the fitting room was

left that way.  Pl. Dep. 131:19.  These circumstances were that

> [plaintiff] was swamped and did not have time to sort and hang, because she was
> busy doing everything herself without help, and that she had gotten sick that
> morning and requested to go home, and was persuaded by [supervisors] to stay
> because they were shorthanded, that they needed someone to answer the phone,
> and that they told her that if all she could do was put people in fitting rooms and
> answer the phone that was what they needed, and they would try to send someone
> else to sort the carts.

Pl.'s Mem. at 10-11.

## DISCUSSION

Plaintiff has brought the following claims under the Oregon Act: (1) hostile work

environment, (2) failure to accommodate, (3) failure to engage in the interactive process, (4)

unlawful discharge, and (5) retaliation.  Plaintiff also seeks front and back pay and punitive

damages.

Defendant argues that plaintiff is not an "otherwise qualified person" under the Oregon

Act and that, accordingly, all of her claims fail as a matter of law.  ORS 659A.112(1).  An

individual is "qualified" under the Oregon Act if the individual, "with or without reasonable

accommodation, can perform the essential functions of their position."  ORS 659A.115.

"Essential functions" are "the fundamental job duties of a position a disabled person holds or

desires" with "due consideration . . . given to the employer's determination as to the essential

PAGE 8 - OPINION AND ORDER

functions of a position."  Oregon Administrative Rules (OAR) 839-006-0205(4); ORS 659A.115.
Disabilities that are too severe to be remedied through reasonable accommodation render an
individual unqualified and, therefore, outside the statute's protection.

Defendant contends that, with or without reasonable accommodation, plaintiff could not
perform the essential functions of the fitting room position.  Defendant points to plaintiff's
ninety-day performance review and the citations plaintiff received for not keeping the fitting
room tidy.  Defendant also relies on the declarations of co-workers, who have testified that
plaintiff's job performance was deficient.

Plaintiff argues that she was capable of performing the essential functions of a changing
room attendant.  Plaintiff points to the declarations of two co-workers, Becky Kincade and
Dorothy Malsom.  Pl.'s Kincade Decl. ¶ 3 ("Generally, Ms. Austin was able to do her job
effectively."); Pl.'s Malsom Decl. ¶ 3 ("Ms. Austin performed her duties well as a fitting room
attendant.").

Defendant has also offered declarations from Kincade and Malsom.  This second set of
declarations paints a less rosy picture of plaintiff's job performance.  Def.'s Kincade Decl. ¶ 3
("Ms. Austin was a below-average fitting room attendant . . . . She had significant difficulty
placing [bras and swimwear] on the small hanger hooks, as required."); Def.'s Malsom Decl. ¶ 3
("Ms. Austin could not work as fast as the fitting room job required.  She had significant
problems hanging clothes and frequently needed to either re-do her work, or have other
associates, such as myself, re-hang some of her clothes.").  It is unclear whether the declarations
introduced by defendant actually contradict the declarations introduced by plaintiff.  *See Sec.
and Exch. Comm'n v. Phan*, 500 F.3d 895, 910 (9th Cir. 2007) (holding that the district court
erred in rejecting defendant's declarations because they did not flatly contradict earlier

testimony).  For instance, Kincade's opinion that plaintiff was a "below-average" fitting room attendant is not necessarily incompatible with Kincade's opinion that plaintiff was generally able to do her job well.

Assuming *arguendo* that Kincade and Malsom made inconsistent statements about plaintiff's job performance, summary judgment is nevertheless unwarranted.  The jury may consider inconsistent statements in assessing the weight and believability of Kincade and Malsom's testimony.  "[C]ourts have long recognized that summary judgment is singularly inappropriate where credibility is at issue."  *S.E.C. v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir. 1978).  Kincade and Malsom testified that plaintiff did her job "effectively" and "well." A reasonable jury, relying upon this evidence, could conclude that plaintiff was able to perform the essential functions of the fitting room associate position.  *See Sankovich*, 638 at 140 (observing that summary judgment is improper where different ultimate inferences may be drawn from evidence (citing Fed. R. Civ. P. 56(c)).

Plaintiff's assertion that she was not provided reasonable accommodation also undermines defendant's argument.  Individuals are "qualified" for purposes of the Oregon Act if they can perform the essential functions of their position *with* or without reasonable accommodation.  As is discussed below, there is evidence that defendant failed its duty to provide reasonable accommodations and to engage in the interactive process.  Despite plaintiff's poor job performance, "[t]his is not a case where it is obvious that no modification could enable the employee to perform the essential functions of a job or where the employee has caused the process to break down."  *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1117 (9th Cir. 2000) (en banc), *vacated on other grounds*, 535 U.S. 391 (2002).  There is at least a triable issue of fact as to

whether plaintiff would have been able to perform the essential duties of her job had defendant

offered reasonable accommodations.

Construing the facts in the light most favorable to the non-moving party, defendant's

argument that plaintiff is not a "qualified individual" fails. Accordingly, the court must

determine whether defendant violated the Oregon Act.

### 1.      Hostile Work Environment

Plaintiff asserts that she was subjected to a hostile work environment because of her

disability. Disability-based harassment claims are cognizable under the Oregon Act. *See*

*Wheeler v. Marathon Printing, Inc.*, 974 P.2d 207, 214 (Or. Ct. App. 1998). Federal decisions

are generally "instructive" when analyzing these claims. *Fred Meyer v. Bureau of Labor and*

*Indus.*, 954 P.2d 804, 808 (Or. Ct. App. 1998); ORS 659A.139. To make a *prima facie* case of

hostile work environment, a plaintiff must show that: (1) she was a member of a protected class;

(2) she was subjected to verbal or physical conduct "because of" her disability; (3) this conduct

was unwelcome; and (4) the conduct was sufficiently severe or pervasive to alter the conditions

of plaintiff's employment. *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003); *see*

*Wheeler*, 974 P.3d at 214 ("because of" element required under Oregon law); *Fred Meyer*, 954

P.2d at 808 (severe or pervasive element required under Oregon law).

In evaluating the objective hostility of a work environment, the factors to be considered

include the "frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

"The required level of severity or seriousness varies inversely with the pervasiveness or

frequency of the conduct." *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872 (9th Cir. 2001)

PAGE 11 - OPINION AND ORDER

(quotation omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation and citation omitted).

Plaintiff contends that, during her employment, she was harassed by Camille Mast. Plaintiff's claim turns on whether this conduct was sufficiently severe or pervasive to alter the conditions of her employment.

Defendant argues that plaintiff cannot satisfy the severe or pervasive element of her *prima facie* case.  Defendant points out that plaintiff "cannot point to slurs, epitaphs [sic], or statements of ridicule" and that Mast only criticized her work performance.  Def.'s Mem. in Supp. of Mot. for Summ. J. (Def's Mem.) at 17-18.  In addition, defendant emphasizes that plaintiff did not have daily contact with Mast:  Plaintiff testified at her deposition that her contact with Mast varied.  Pl. Dep. 95:13-16 ("There's times where I didn't see her for weeks. There's times where I saw her every day, or, you know, there's times where she didn't even come near the fitting room, so it varies.").

Defendant also emphasizes that Mast was unpleasant and abrasive to a number of subordinates.  Def.'s Kinkade Decl. ¶ 4 ("I know of many other employees besides Ms. Austin who have been sharply criticized by Ms. Mast, who I believe is a perfectionist"); Def.'s Malsom Decl. ¶ 4 (Mast "frequently criticized the work of other employees"); Dale Decl. ¶ 5 ("Ms. Mast raised her voice at both myself and Ms. Austin on numerous occasions."); Dubose Decl. ¶ 6 ("I have had significant, on-going problems with Camille Mast[.]"); Higgins Decl. ¶ 5 ("I personally witnessed Ms. Mast treat other employees besides Ms. Austin with disrespect."); Wagar Decl. ¶ 5 ("On several occasions, Ms. Mast used the same harsh tone and raised voice with me as I had

PAGE 12 - OPINION AND ORDER

witnessed her use with Ms. Austin.").  In response, plaintiff argues that Mast was unpleasant to plaintiff in unique ways.  Pl.'s Kincade Decl. ¶ 4 ("Ms. Mast was constantly negative toward Ms. Austin in ways she was never negative to anyone else.); Pl.'s Malsom Decl. ¶ 5 ("Camille Mast singled Ms. Austin out by criticizing and yelling at her for doing things that others would be able to do without criticism.").

In order to be actionable, harassment must be both subjectively and objectively offensive. *Nichols*, 256 F.3d at 872-74.  There is ample evidence that plaintiff found Mast's conduct offensive.  Plaintiff made numerous complaints about Mast's behavior.  Pl. Dep. 54:14-55:10, 56:13-57:13, 77:13-19, 143:7-144:18.  Mast's criticisms also made plaintiff cry on a number of occasions.  Pl.'s Malsom Decl. ¶ 8 ("I found Ms. Austin bawling at work on a number of occasions at which times she would inform me she had just been yelled at by Ms. Mast."); Pl.'s Kincade Decl. ¶ 7 ("I would come to work to find Ms. Austin in tears approximately once a week.").

It is less clear whether Mast's conduct is objectively severe or pervasive.  Construing the facts in the light most favorable to the plaintiff, Mast is guilty of the following: throwing clothes in plaintiff's direction, not answering plaintiff's questions, not allowing plaintiff to use a cart even if other employees could, and asking a single time whether plaintiff could read after she incorrectly hung up a piece of clothing.  Mast yelled at plaintiff "a lot," which plaintiff defined as "[p]robably" more than ten times.  Pl. Dep. 142:8-18.  In addition, Mast was allegedly entertained when plaintiff's wheelchair became stuck and later told a co-worker "how stupid" plaintiff sounded when she cried for help.  This statement occurred outside of plaintiff's presence, a fact that lessens but does not undo its offensiveness.

PAGE 13 - OPINION AND ORDER

Plaintiff also claims that Mast informed management that she had lice.  Plaintiff, however, admits that she did have lice on multiple occasions.

Plaintiff testified that Mast repeatedly yelled criticisms at her, including: "You didn't do this right, you need to redo this, this isn't folded correctly, do it over again."  Pl. Dep. 139:5-8. Unlike most harassers, Mast never used slurs or derogatory terms when speaking to plaintiff. *See Shaver*, 350 F.3d at 721 (plaintiff, who suffered from epilepsy, was called "platehead" and "stupid" by several co-workers).  At most, Mast's single comment that plaintiff was unable to read could be interpreted as implying that disabled individuals are unintelligent.  Other than that comment, however, Mast's comments and actions did not implicate plaintiff's disability.

In *Vazquez v. County of Los Angeles*, 349 F.3d 634, 638 (9th Cir. 2003), the plaintiff worked as a probation officer at a youth detention center.  The plaintiff, who was Hispanic, alleged that his supervisor exposed him to a hostile work environment because of his race.  The supervisor told plaintiff that he had a "typical Hispanic macho attitude" and that he should transfer to another position because "Hispanics do good in the field."  *Id.* at 643.  The supervisor yelled at the plaintiff on two occasions.  *Id.*  In addition, plaintiff alleged that his supervisor made negative comments about him to others and filed false complaints about him.  *Id.*  The Ninth Circuit concluded that the "allegedly harassing incidents, which occurred over the course of more than one year and only two of which contained racially related epithets, did not create a hostile work environment for Vazquez."  *Id.* at 644.  Similarly, the allegedly harassing incidents in this case, which occurred over a ten month period and do not involve any disability related epithets, did not create a hostile work environment for plaintiff.

The conduct in this case does not rise to the same level of outrageousness as those cases where the Ninth Circuit has concluded that harassment was severe or pervasive.  *Compare*

PAGE 14 - OPINION AND ORDER

*Manatt v. Bank of Am.*, 339 F.3d 792, 798 (9th Cir. 2003) (finding that employees who used the phrase "China man" and pulled their eyes back with their fingers to mock the appearance of Asians did not create a hostile work environment for a Chinese woman); *and Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (finding no hostile work environment where supervisor referred to a female superintendent as a "castrating bitch," "madonna," or "regina" and called the plaintiff "Medea"); *with Kang v. U. Lim Am.*, *Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (finding harassment where employer verbally and physically abused plaintiff because of his race, including informing plaintiff on numerous occasions that he had to work harder because he was Korean and that Koreans did not work as hard as others); *and Nichols*, 256 F.3d at 872-73 (finding a hostile work environment where employee was called "faggot" and "fucking female whore" by co-workers and supervisors at least once a week and often several times a day); *and Draper v. Coeur Rochester*, 147 F.3d 1104, 1109 (9th Cir. 1998) (finding hostile work environment where supervisor made repeated sexual remarks to plaintiff employee, told her his sexual fantasies and that he wanted to have sex with her, commented on her physical characteristics, and asked over a loudspeaker if she needed help changing her clothes).

    Considering all of the factors, plaintiff has not demonstrated that Mast's conduct was objectively severe or pervasive. The frequency of the allegedly discriminatory conduct varied, with plaintiff sometimes going weeks without seeing Mast. Mast threw clothing in plaintiff's direction but did not otherwise physically threaten plaintiff. *See Kang*, 296 F.3d at 814 (harassment was physically threatening where supervisor struck plaintiff in the head with a metal ruler on approximately twenty occasions, kicked him in the shins, pulled his ears, and threw a variety of objects at him including metal ashtrays). And, although Mast allegedly exposed

PAGE 15 - OPINION AND ORDER

plaintiff to humiliation by yelling at her in front of customers and co-workers, Mast's criticisms focused on plaintiff's work performance and did not involve offensive or discriminatory terms.

The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view." *Faragher*, 524 U.S. at 788. The record shows that Mast repeatedly yelled at plaintiff and angrily pulled clothing off hangers, sometimes throwing items in plaintiff's direction. The court's conclusion does not condone this behavior; it was rude and unprofessional. Plaintiff, however, was not subjected to harassment that was sufficiently extreme or outrageous. Because plaintiff cannot establish a *prima facie* case, the hostile work environment claim is dismissed.

### 2.      Duty to Accommodate

Oregon Revised Statutes 659A.112(e) requires that an employer "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified person with a disability," unless doing so would impose an undue hardship. "The essence of the concept of reasonable accommodation is that, in certain instances, employers must make special adjustments to their policies for individuals with disabilities." *McAlindin v. County of S.D.*, 192 F.3d 1226, 1237 (9th Cir. 1999). Reasonable accommodations are modifications or adjustments that enable an employee to perform the essential functions of the job.

Defendant argues that it accommodated plaintiff's disability in a variety of ways. Defendant suggests that its duty to accommodate was satisfied when it offered to transfer plaintiff to the people greeter position.

Defendant offered to transfer plaintiff before she had received her ninety-day performance evaluation or been offered other accommodations. Although reassignment to a vacant position is a form of reasonable accommodation, it is a last resort that should only be

PAGE 16 - OPINION AND ORDER

considered once the employer has attempted to reasonably accommodate an employee in his or

her current position.  Otherwise, employers could segregate disabled employees by forcing

reassignments to undesirable positions.  *See* Appendix to 29 C.F.R. § 1630.2(o).  Indeed,

plaintiff asserts that she found the people greeter position to be "demeaning."  Pl.'s Mem. at 3

n.3.  The court disagrees that defendant's offer to transfer plaintiff extinguished its duty to

accommodate plaintiff in her fitting room position.

Defendant argues that summary judgment is justified, even if a continuing duty to

accommodate plaintiff existed.  During her employment, plaintiff requested the following

reasonable accommodations: (1) the grabber, (2) a cordless phone, (3) the use of hangers to pre-

hang clothes, and (4) the use of a shopping cart as a staging area.

Although defendant agreed to purchase a replacement grabber for plaintiff, it did not

arrive before she was terminated.  Plaintiff, however, has not indicated when she requested this

grabber.  Thus, the court cannot determine whether defendant failed to accommodate plaintiff in

a reasonable amount of time.

A cordless phone was not a reasonable accommodation.  Defendant has indicated that a

cordless phone was not feasible, because it would have prevented plaintiff from transferring calls

to other departments.  It is plaintiff's responsibility to establish that a given accommodation is

feasible and plaintiff has not done so.  *See Braunling v. Countrywide Home Loans Inc.*, 220 F.3d

1154, 1157 (9th Cir. 2000) ("The plaintiff has the burden of providing at least a facial showing

that a reasonable accommodation is possible."); *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254,

255 (1st Cir. 2001) ("In order to prove 'reasonable accommodation,' a plaintiff needs to show not

only that the proposed accommodation would enable her to perform the essential functions of her

PAGE 17 - OPINION AND ORDER

job, but also that, at least on the fact of things, it is feasible for the employer under the circumstances.").

Defendant did not properly accommodate plaintiff's requests to pre-hang her clothing on the rack or use a shopping cart to stage her work. Defendant points out that several managers approved these practices. Plaintiff agrees that her direct managers allowed her to stage her work differently and that the "only one that had a problem with it most of the time was Camille [Mast]." Def.'s Mem. at 27; Pl. Dep. 58:4-5. Plaintiff argues that the approval of her managers was "rendered ineffective by Ms. Mast, the merchandising supervisor, who berated and interfered" with plaintiff's attempted accommodations. Pl.'s Mem. at 19.

"Whether an employer has met its burden to reasonably accommodate an employee is ordinarily a question of fact for the jury." *Stamper v. Salem-Keizer Sch. Dist.*, 97 P.3d 680, 682 (Or. Ct. App. 2004). Although the court has concluded that plaintiff was not subjected to illegal harassment, there is evidence in the record from which a jury could conclude that Mast obstructed plaintiff's proposed accommodations. For example, plaintiff testified that Mast told her not to use a cart and pulled improperly hung clothing off the rack "[v]ery often." Pl. Dep. 63:20-64:2, 95:8-10. Even if Mast was not a direct supervisor with authority to "formally evaluate, discipline, or discharge" plaintiff, Mast was a merchandising supervisor whose suggestions plaintiff could be expected to follow. Def.'s Mem. at 32. A reasonable jury could conclude that Mast's repeated attacks on plaintiff's work performance vitiated the approval of her direct supervisors, and that defendant did not accommodate plaintiff.

### 3.    Interactive Process

Under the Oregon Act:

PAGE 18 - OPINION AND ORDER

> Once an otherwise qualified employee or applicant with a disability has requested reasonable accommodation or otherwise disclosed to the employer a disability that may require reasonable accommodation, the employer has a duty to initiate a meaningful interactive process with the employee or applicant to determine whether reasonable accommodation would allow the employee or applicant to perform the essential functions of a position held or sought.

OAR 839-006-0206(4) (2007). "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees." *Barnett*, 228 F.3d at 1114. "Employers who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if reasonable accommodation would have been possible." *McAlindin*, 192 F.3d at 1237. The Ninth Circuit has observed that providing reasonable accommodations is a "continuing duty that is not exhausted by one effort." *Id*. (quotation omitted).

Defendant argues that Oregon does not have a stand-alone cause of action for failure to engage in the interactive process. This court disagrees. The Ninth Circuit concluded in *Barnett* that "an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process." 228 F.3d at 1116. Oregon Administrative Rule 839-006-0206(4) took effect on February 1, 2007. The court agrees with plaintiff that this regulation expressly clarified that ORS 659A.112 requires an employer to engage in the interactive process. *See also Paul v. Fred Meyer Stores, Inc.*, No. 06-CV-1404-JE, 2008 WL 2787855, *8 (D. Or. July 14, 2008) (concluding that there is an independent duty to engage in the interactive process under both the ADA and the Oregon Act).

There is evidence that defendant did not fulfill its duty to engage in the interactive process. Plaintiff is in a wheelchair and indicated at her original interview that she might need reasonable accommodations to perform her job. Defendant acknowledges that plaintiff struggled

PAGE 19 - OPINION AND ORDER

in her new position and that plaintiff's supervisors "determined in short order that she could not perform the duties" of a fitting room associate. Def.'s Mem. at 1. Later in her employment, plaintiff told defendant's store manager that she needed accommodations and that Mast was preventing her from modifying her work environment.

Despite knowledge of plaintiff's disability and serious concerns about plaintiff's ability to perform her job, defendant made minimal efforts to help plaintiff: a supervisor suggested that plaintiff use a cordless phone, defendant offered plaintiff a lateral transfer, and plaintiff's direct supervisors allowed her to pre-hang clothing and stage her work. These efforts were wholly ineffective: defendant argues a cordless phone was not feasible, the offer of transfer was premature, and plaintiff's proposed accommodations were compromised by Mast's behavior. The court acknowledges that defendant reimbursed plaintiff for purchasing the first grabber and promised to procure a second grabber for her.

Other than reimbursing plaintiff for the first grabber, however, it is not clear what defendant did to assist plaintiff. According to plaintiff, "nobody at Wal-Mart approached me with any ideas for accommodations or to find out what kind of help I might need to do my job better or more quickly. . . . I was not asked questions about how my disability affected my ability to perform specific duties or asked if anything might help solve problems I was having performing specific duties." Pl. Supplemental Decl. ¶ 4. Not only did defendant not approach plaintiff regarding possible accommodations, defendant had notice that Mast was interfering with plaintiff's proposed accommodations and did nothing to restrain her. Although defendant alleges that managers spoke to Mast about her conduct, Mast denies ever being told not to yell at plaintiff. Def.'s Reply Mem. at 25; Mast Dep. 25:5-9. Construing the facts in the light most

favorable to the non-moving party, a jury could conclude that defendant failed to engage in the interactive process in good faith.

### 4.    Unlawful Discharge

The Ninth Circuit analyzes ADA cases using the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003).  Although Oregon courts analyzing claims under the Oregon Act have rejected the *McDonnell Douglas* burden-shifting approach, *see Callan v. Confed. of Or. Sch. Admin.*, 717 P.2d 1252, 1254 (Or. Ct. App. 1986), that approach is maintained for assessing Oregon employment discrimination claims brought in federal court.  *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1092-93 (9th Cir. 2001).  "The standard for establishing a *prima facie* case of discrimination under Oregon law is identical to that used in federal law."  *Id.* at 1087.

To establish a *prima facie* case of disability discrimination, a plaintiff must prove that: 1) she is a qualified individual with a disability; 2) she has suffered an adverse employment action; and 3) a causal connection exists between the adverse employment action and the disability. *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001); *see also Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).  The requisite degree of proof necessary to establish a *prima facie* case of discrimination on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

Once a *prima facie* case is presented by a plaintiff, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  The plaintiff is then afforded an opportunity to demonstrate that the employer's proffered reason is pretextual, "either directly by persuading the court that a discriminatory reason more

PAGE 21 - OPINION AND ORDER

likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Defendant argues that plaintiff cannot establish her *prima facie* case, because there is no evidence that a causal connection exists between her termination and her disability. Defendant contends that plaintiff was disciplined, and ultimately fired, for violating defendant's meal-break policies and for not performing her duties. This argument is supported by plaintiff's admissions that she violated the meal-break policies and that the fitting room was messy the day before plaintiff was terminated.

An "unlawful discharge claim requires a showing that the employer terminated the employee because of his disability." *Humphrey,* 239 F.3d at 1139. However,

> [f]or purposes of the ADA, with a few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination. The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability.

*Id.* at 1139-40.

A jury could conclude that plaintiff's performance inadequacies were caused by plaintiff's cerebral palsy, and compounded by defendant's failure to make reasonable accommodations. Accordingly, this court concludes that a sufficient causal connection exists between plaintiff's termination and her disability. Defendant's proffered reason for terminating plaintiff is not a legitimate, nondiscriminatory reason and summary judgment is therefore unwarranted.

## 5.    Retaliation

To make out a *prima facie* case of retaliation, plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment action. *Raad v. Fairbanks N. Star Borough Sch.*

PAGE 22 - OPINION AND ORDER

*Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003).  The causal connection element may be met based on

the "temporal proximity of the adverse action" and a request for reasonable accommodation.

*Barnett*, 228 F.3d at 1120; *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Causation

sufficient to establish . . . [a] prima facie case may be inferred from circumstantial evidence,

such as the employer's knowledge that the plaintiff engaged in protected activities and the

proximity in time between the protected action and the allegedly retaliatory [activity].").

Thereafter, the burden of production shifts to the employer to present legitimate, nonretaliatory

reasons for the adverse employment action.  *Yartzoff*, 809 F.2d at 1376.  Once the employer

carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the

reason advanced by the employer was a pretext.  *Id.*

     Plaintiff has made out a *prima facie* case.  Plaintiff made numerous requests for

accommodations, as well as numerous complaints about Mast's abusive behavior.  Even if Mast's

behavior is not actionable harassment, employees are protected from retaliation "whenever the

opposition is based on a 'reasonable belief' that the employer has engaged in an unlawful

employment practice."  *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir.

1983).  Plaintiff suffered adverse employment actions; she received several warnings for

violating defendant's policies and was eventually terminated.  Finally, the causal connection

element is met based on temporal proximity between plaintiff's protected activity and the adverse

employment actions.

     Defendant contends that the adverse employment actions were justified by plaintiff's poor

work performance.  Several facts support defendant's explanation.  First, the record clearly

establishes that defendant was concerned about plaintiff's work performance throughout her ten

months of employment.  These genuine concerns suggest that the adverse employment actions

PAGE 23 - OPINION AND ORDER

were nonretaliatory.  Second, substantial evidence in the record indicates that plaintiff's work performance was, in fact, unsatisfactory.  Plaintiff does not contest that she violated defendant's meal-break policy or that she left the fitting room messy the day before she was terminated.  Thus, defendant had legitimate reasons for disciplining plaintiff.  Third, defendant reimbursed plaintiff for the first grabber, suggesting it would not retaliate against plaintiff for other requested accommodations.  Fourth, plaintiff admits that her primary antagonist was Mast and that her other managers generally approved her proposed accommodations.

Plaintiff has not demonstrated a genuine issue of material fact as to whether the reasons advanced by defendant were pretextual.  Mast was not involved in the decision to discipline plaintiff.  Mast Dep. 12:5-7.  There is no evidence that Solis, the supervisor who did discipline plaintiff, was motivated by disability-based animus.  Moreover, plaintiff has admitted that she violated defendant's meal-break policy and left the fitting room in an unsatisfactory condition the day before she was terminated.

As discussed above, there is evidence that defendant's passivity violated its duty to provide reasonable accommodations and to engage in the interactive process.  However, there is no evidence that defendant or its agents affirmatively retaliated against plaintiff for seeking reasonable accommodations.  Accordingly, plaintiff's retaliation claim is dismissed.

**6.    Back and Front Pay**

Defendant moves for partial summary judgment of plaintiff's claim for back and front pay.  Plaintiff earned $8.85 an hour working for defendant as a part-time associate.  She was terminated on June 28, 2007.  Plaintiff now earns $7.95 an hour and is a full-time employee.  She began her new job on April 1, 2008.

PAGE 24 - OPINION AND ORDER

Defendant asserts that because she now earns more per week than she earned working for defendant, plaintiff should only recover front and back pay through April 1, 2008, when her new employment commenced.

Back and front pay "restores the terminated employee to the economic position that the employee would have enjoyed, were it not for the employer's unlawful conduct." *Tadsen v. Praegitzer Indus., Inc.*, 928 P.2d 980, 983 (Or. 1996). Although plaintiff earns more per week than she did working for defendant, plaintiff is assigned more hours – and, significantly, is paid less per hour – at her current position. Under the exacting summary judgment standards, this court cannot yet conclude as a matter of law that – under the facts presented – plaintiff has been restored to the economic position that she would have otherwise enjoyed.

**7.    Punitive Damages**

To recover punitive damages, a plaintiff must prove that a defendant has acted with "malice" or shown a "reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety, and welfare of others." ORS 31.730(1). The "imposition of punitive damages [requires] a degree of culpability greater than inattention or simple negligence." *Badger v. Paulson Inv. Co.*, 803 P.2d 1178, 1186 (Or. 1991). Punitive damages are not recoverable unless ORS 31.730's elements are shown "by clear and convincing evidence." ORS 31.730(1).

The Supreme Court has interpreted nearly identical terms to refer not to the egregiousness of an employer's conduct, but rather to the employer's knowledge that it may be acting in violation of federal law. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999) ("The terms 'malice' or 'reckless [indifference]' ultimately focus on the actor's state of mind."). Plaintiff has adduced evidence that defendant was aware of its obligations to reasonably

PAGE 25 - OPINION AND ORDER

accommodate a disabled employee and to engage in the interactive process if a reasonable

accommodation was required.  Moore Dep. 7:1-17.  Here, as the court held above, summary

judgment is denied with regard to plaintiff's reasonable accommodation and interactive process

claims.  Because evidence supports plaintiff's claim that defendant ignored its duties under the

Oregon Act, plaintiff's claim for punitive damages survives summary judgment.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment [35] is GRANTED

in part and DENIED in part.  Defendant's motion is GRANTED as to plaintiff's hostile work

environment and retaliation claims brought pursuant to ORS 659A.112 *et seq*.  Defendant's

motion is DENIED as to plaintiff's reasonable accommodation, failure to engage in the

interactive process, and unlawful termination claims.  In addition, defendant's motion is

DENIED as to plaintiff's claims for front and back pay and punitive damages.

IT IS SO ORDERED.

DATED this  14  day of November, 2008.


      /s/ Ancer L. Haggerty
      Ancer L. Haggerty
      United States District Judge

PAGE 26 - OPINION AND ORDER